## The Bank of Louisiana *v.* Briscoe.

The provision of article 2895 of the Civil Code, establishing the rate of conventional interest, has always been confined to loans of money, and held not to apply to the purchase and sale of promissory notes, bills of exchange or other negotiable instruments, nor of credits.

An exchange of credits made *bonâ fide*, is not illegal ; *aliter*, if the exchange be a mere device to cover usury. In every case the inquiry is, whether the transaction was, in substance, a loan of money; if really a sale or exchange of credits, it will be valid though the contract be in the form of a loan.

Where the facts of a case present a double aspect, one of which represents a contract which the law authorizes, and the other one prohibited by law, the contract must be sustained.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. *L. Peirce*, for the plaintiffs. *Benjamin* and *Micou*, for the appellant. The judgment of the court was pronounced by

EUSTIS, C. J. The defendant obtained an injunction against the executory process issued for the sum of $14,400 with interest, on an authentic act, by which his property was mortgaged to secure the payment of the sum of $18,000, with interest, &c., the amount of a bond executed by him in favor of the *Bank of Louisiana*. The injunction was dissolved after a trial of the cause on its merits, and the defendant has appealed. It has been argued before us as presenting a question of usury.

On the 22d of April, 1838, the defendant wrote to the cashier of the bank applying for a loan of money, on a mortgage of his plantation and slaves in the parish of Concordia. To this letter the cashier replies in a letter, under date of the 7th of May following, addressed to the defendant in Rodney, Mississippi, that "the bank has some funds in the Planters' Bank of Natchez, which you can obtain the loan of, say $18,000, under the terms of the charter, on mortgage, &c.," and adds, "let me hear from you, as I have other applicants for it." On the 3d of May, on the application of the defendant, a resolution had been passed by the directors of the bank, agreeing to loan him $18,000, under the terms of the charter, on mortgage, on his titles to the property offered proving satisfactory. The defendant, by a letter from Port Gibson, Mississippi, of date the 19th May following, accepts the offer of the loan on the terms proposed in the letter of the cashier, gives information concerning his titles, and expresses his desire that the act of mortgage may be sent to him for signature, but if his presence in New Orleans be required, he states he will then be there without delay. Under date of the 22d May, from Vidalia, the defendant forwards to

the cashier his title papers and certificate of non-hypothecation: he reiterates in this letter his desire of not going to New Orleans, unless necessary for the execution of the mortgage; he adds "a check for the money could also be forwarded to me, at Rodney, Mississippi." On the 30th of June, the cashier notified the defendant at Port Gibson, that the bond and mortgage had been received, and the discount made for the nett proceeds of which, $16,443, he was requested to call on the cashier of the Planters' Bank at Natchez, who would pay it.

On the same date he writes to the cashier of the Planters' Bank enclosing a blank check for the defendants' signature. The portion of the letter which is relative, reads thus: "Enclosed, I send you *William Briscoe's* check on this bank for $16,443, to your order, nett proceeds of loan mortgage, and which you will please pay to him and charge the same to our account; and, on return of the check, we will give you credit for the same. I have written to *Mr. Briscoe*, at Port Gibson, by this mail, to call on you and receive his money. I was about sending him a check on your bank for the amount, but our attorney thinks best for you to pay his check on us." *Mr. Briscoe* when here, mentioned to me that he must have nothing but Natchez Bank money, and which I hope you will give him."

The defendant had, in the meantime, gone to the north; the check was forwarded to him, and, on his signature, the amount was paid in notes of the Planters' Bank. The Planters' Bank suspended specie payments in May, 1837, resumed them in December, 1838, and continued paying specie during the early part of 1839. It again suspended, and has not since resumed, and is not now, nor was it in 1838, able to pay its obligations. Evidence was admitted showing the depreciation of Natchez bank notes in New Orleans. according to the rates quoted in the price-currents of the day, which, on the 30th of June, 1838, would amount to about twenty-seven per cent.

These facts, it is said, constitute a case of usury, the bank having received for the loan nine per cent per annum, the highest rate of interest permitted by its charter, and a profit of twenty-seven per cent "*resulting from the exchange of depreciated credits for mortgage security at par.*" It appears that these banks had been doing business together, and at the time the loan was made the Planters' Bank was indebted to the Bank of Louisiana in an amount exceeding that of the check paid by the former. From February, 1839, the transactions between them were heavy during that year, and the accounts between them were not closed till 1843. The debt to the Bank of Louisiana, was, therefore, always paid with interest, as the accounts in evidence show; and there is nothing before us which shows that the suspension of specie payment by the Planters' Bank, which existed at the time of the loan and which terminated in December, 1838, when it resumed payment, was considered by those who administered the affairs of the bank as jeoparding the debt due by the former, which bore interest and was demandable at any time in specie.

The more recent cases referred to by the counsel for the defendant in support of his argument are those of *Coxe* v. *Rowley*, 12 Rob. 273, and the *Canal Bank* v. *Hagan*, 1 An. Rep. 68,; those of *Owens*, 2 Peters, 527, *Waggener*, 9 Peters, 389, have been commented upon. The counsel who argued the case of *Coxe* v. *Rowley*, collected a great number of decisions of courts of the different States on the subject of usury which relate to loans of depreciated bank notes, which will be found in the report of that case. They have been examined and considered, and the conclusions to which we have arrived have not been

adopted without the most thorough investigation which our other labours have <span>BANK OF</span>
permitted us to give to the subject.  This is given as a reason for not noticing <span>LOUISIANA</span>
in detail several cases, which apparently conflict with this decision. <span>v.</span>
<span>BRISCOE.</span>

In *Hagan's* case the rule settled in *Owen's* case, and which had been frequently recognized by our courts, was applied to a state of facts materially different from those of this case.  The contract was exclusively one of loan, and the lender was considered as having taken advantage of the necessities of the borrower to exact, in addition to the highest rate of interest which could be demanded lawfully, a mortgage for an enormous debt due by third persons.

In *Rowley's* case, Judge Bullard, in delivering the opininion of the court, says, after stating that a loan of depreciated bank notes payable by the borrower in money at a rate which added to the depreciation will exceed the highest rate of conventional interest, is undoubtedly usurious: "We do not mean to say that in all cases a loan of depreciated currency is always and essentially usurious; cases may be supposed in which it would be perfectly legal.  The case of *The United States* v. *Waggener*, illustrates this position, &c."  In that case the court considered that it was incontestably established that, in point of fact, the contract was for a loan of depreciated stocks and currency, as if it had been specie ; and the rate at which the stocks alone were taken would have brought the case within the general rule, independent of the depreciation of the bank notes.   In *Waggener's* case, the Supreme Court of the United States applied the construction of the usury laws in England, to a contract made by the Bank of the United States under its charter.  The article of our Code, upon which our decisions on this subject are based, is a simple prohibition of taking more than ten per cent interest on loans of money : "The amount of the conventional interest cannot exceed ten per cent ; the same must be fixed in writing, and testimonial proof of it is not admitted in any case."  Art. 2895.   By the 14th section of the charter of the Bank of Louisiana, it is provided that, "said corporation shall not take more than nine per cent per annum upon any of its loans or discounts."

The operation of this article of the Code has always been limited to loans of money.   No evasion of it has ever been tolerated, but it has always been confined to its true intent, and been held not to apply to the purchase and sale of promissory notes, bills of exchange, and other negotiable instruments, nor to the transfer and sale of credits.   Under the construction above mentioned the court, in *Waggener's* case, held that a loan of notes of the Bank of Kentucky, which were then at a discount of from thirty-three to forty per cent, made by the Bank of the United States on a note payable in three years, with interest at six per cent, was not usurious.   The Bank of Kentucky had agreed to pay interest at six per cent on its notes, and all its notes held by the Bank of the United States were ultimately paid, and the loan was made to the borrower on his application for the loan of $5,000 of said notes, saying they would answer his purpose as well as gold and silver.

The debt due by the Planters' Bank bore interest, and the debt, of which the sum received by the defendant formed a part, was not only paid to the Bank of Louisiana, but large transactions in money took place between them afterwards, and the notes received by the defendant would have been paid on presentment at the bank in less than six months after he took them.   It is true the rate of interest which the contract between the defendant and the bank bore, exceeded that of the debt due by the Planters' Bank, but the rate was that allowed by the charter, and no distinction can be made between the cases on

that account. In principle they are identical, except that in this case the funds were in a bank in another State ; and it is by no means clear that the defendant would not have had a right to demand a check on the Planters' Bank for the nett proceeds of his discount, which the Bank of Louisiana had evidently no interest in refusing, as there was no privity between the defendant and the Planters' Bank, and no agreement n othe part of the Bank of Louisiana, by which it forebore to exact its demands in specie. The mode in which the payment was made was a matter of acquiescence, rather than of contract. With these exceptions, which are in favor of the plaintiff's case, the principle settled in *Waggener's* case is certainly applicable to the facts of this. The court considered the transaction between the borrower and the bank as a *bond fide* exchange of credits, for his accommodation. The contract, as closed by the defendant, was for funds in the Planters' Bank of Natchez, for which he was to give his bond and mortgage, and have the benefit of renewal under the provisions of the charter of the bank, during the space of five years from its date. " A *bonâ fide* exchange of credits is not *per se* illegal, though it may be so if it is a mere shift or device to cover usury. If the application be not for a loan of money, but for an exchange of credits or commodities, which the parties *bonâ fide* estimate at equivalent values, it seems difficult to find any ground in which to rest a legal objection to the transaction. Because an article is depreciated in the market, it does not follow that the owner is not entitled to demand or require a higher price for it, before he consents to part with it. He may possess bank notes which to him are of par value, because he can enforce payment thereof, and, for many purposes, they may pass current at par in payments of his own debts, or in payment of public taxes, and yet their marketable value may be far less. If he uses no disguise—if he seeks not to cover a loan of money under the pretence of a sale of them, but the transaction is *bonâ fide* what it purports to be, the law will not set aside the contract, for it is no violation of any public policy against usury."

Such is the language of Judge Story, in delivering the opinion of the court, The application of the borrower for the loan is only important as furnishing a clue to the intention of the parties, which must be ascertained from a consideration of all the circumstances attending the contract; and, whatever be its form, the enquiry is, whether the substance of the transaction was really a loan of money ; and, if it be a loan, whether the lender has stipulated for, or taken, a higher rate of interest than the law allows. The form of the contract in this case is for a loan of money, which the defendant promises to pay ; the equivalent was the nominal amount of the funds of the Planters' Bank in Natchez. The business was transacted in writing between the cashier and the defendant, and if there was any indirection or concealment in the affair, it has escaped our observation. The transaction being perfectly lawful and innocent in itself, it is not perceived how any ill directed and misspent artifice, even supposing it to have been practiced, would have effected its validity. So far however from that being the case, the very check on which the bank notes were received identifies it with the mortgage loan. It reads : " *Pay nett proceeds mortgage loan*," &c., and was sent by the bank to the defendant for him to receive the payment. The bond no more disguised the transaction, than the promissory note given did that in *Waggener's* case.

But there is another view of this subject. If it was usurious in the bank to to loan Mississippi funds or dispose of debts due it by the banks of that State,

and exact interest on their nominal value, because they were depreciated, by the same reasoning it was usurious for it to loan its own notes with the interest authorized by its charter, for, at the time of this transaction, June, 1838, the New Orleans banks had all suspended, and their paper was depreciated to from 6 to 8 per cent. All the loans at that time were made in a depreciated currency, and all are liable to the same objection urged against this contract. The difference is merely of degree. For as to what purposes the Natchez bank notes could, or not, be applied in Mississippi, or at the residence of the defendant in Claiborne county of that State, we have no evidence, except that they were at a discount in that State, and at about twenty-seven per cent discount in New Orleans.

The financial state of this part of the country at that time is within the recollection of most of us, and the application of the theory contended for by the counsel for the defendant to the condition of the banks and commercial business at that period, furnishes, in its consequences, the most convincing proofs of its radical error.

The practical views of the law, exhibited in the luminous opinion in *Waggener's* case, appear to us to be conclusive and unanswerable ; and, according to the rule there recognized, we consider the case as an ordinary sale or exchange of a credit in another State, for which the defendant is bound to pay the price agreed upon, according to the terms of his contract. In *Waggener's* case there was a loan of depreciated bank notes for which an obligation was given for the nominal amount, payable in three years, bearing interest. On the facts presented to us under the evidence exhibited by the defendant, we find that, though the contract is in the form of a loan, the real transaction between the parties is one in which the Supreme Court of the United States would hold there was no usury. There is no necessity for our stating that, in determining this case we have subjected the rights of the plaintiffs to the severest standard, to wit, the construction of the usury laws in England and the United States. Paper money being in general use in this country, the court of the last resort of the Union affords us the highest authority on that subject.

Even if the facts of this case presented a double aspect, one of which represented a contract which the law authorizes, and the other one within the prohibition of the Code—the former an exchange of credits, and the latter a loan— the contract, on principle, must be sustained, in the absence of any proof of any exaction on the part of the plaintiff, and of any necessity on the part of the defendant. It was held in the case of *Archibald* v. *Thomas*, 3 Cowen, 284, that where a contract admits of two constructions, one of which would bring it within the statutes of usury and the other leave it without, the latter should be adopted ; and the rule of our law is : "Quoties in stipulationibus ambigua oratio est, commodissimum est id accipi quo res de quâ agitur in tuto sit. L. 80, de Verb. Oblig.

We do not think that the form in which the contract under consideration appears affects at all the merits of the cause. In *Waggener's* case, as we have seen, depreciated bank notes were loaned at par, and the obligation to pay was in the form of a promissory note, secured by a mortgage on real estate, for the nominal amount. Contracts to pay money on a future day are usually, in this country, thrown into the form of promissory notes, for purposes of convenience.

Under the roman law, obligations having quite a different origin were put in

21

BANK OF
LOUISIANA
*v.*
BRISCOE.

the form of a loan, when a definite sum was to be paid. When accounts were closed, a transaction settled, a sale made, or the like, and the debtor did not pay but retained what was due, it was often kept under the form of a loan. The texts are cited in Domat, book 1, tit. 6, sect. 1st, which treats of *Loan and Usury*. The form of the contract is therefore immaterial ; its true character, resulting from its cause and obligations, is alone important in directing our enquiries, and determining its validity.                *Judgment affirmed.*